## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT NASHVILLE

#### FEBRUARY SESSION, 2000

FILED

March 10, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | |
| | * | No. M1999-959-CCA-R3-CD |
| Appellee, | * | |
| | * | |
| | * | WILSON COUNTY |
| vs. | * | |
| | * | Hon. J. O. Bond, Judge |
| HENRY DEQUAN RHODES, | * | |
| | * | (First Degree Felony Murder |
| Appellant | * | Committed in the Perpetration of |
| | * | Aggravated Child Abuse) |

For the Appellant:

**Gregory D. Smith**
Contract Appellate Defender
One Public Sq., Ste 321
Clarksville, Tn 37040

For the Appellee:

**Paul G. Summers**
Attorney General and Reporter

**Kim R. Hepler**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493


**Tom P. Thompson, Jr.**
District Attorney General

**Robert Hibbett**
Asst. District Attomey General
119 College Street
Labanon, TN 37087


OPINION FILED: _____

AFFIRMED


**David G. Hayes,** Judge

## OPINION

The appellant, Henry Dequan Rhodes, was indicted by a Wilson County Grand Jury for first degree felony murder committed in the perpetration of aggravated child abuse. Following a jury trial, he was found guilty of the indicted offense and sentenced to life imprisonment. On appeal, he argues:

I. The evidence is insufficient to sustain a verdict of felony murder; and

II. The trial court erred in admitting certain photographs into evidence.

After review, we find no error of law requiring reversal. The judgment of the trial court is affirmed.

## Background

Shortly after 2:00 a.m. on the morning of November 6, 1996, Lieutenant Ed Denning of the Wilson County Sheriff's Department responded to an emergency "call" at 2104 Locust Grove Road. Arriving at the location, he discovered the appellant, his girlfriend, Christy Yarbrough, and his brother, Deedy Rhodes. Deedy Rhodes was holding sixteen month old Brian Yarbrough, the son of Christy Yarbrough. The child was "limp." Denning believed that the child was either unconscious or deceased. Denning further noticed the odor of alcohol on the people present, as if "there had been a party." The appellant told Lieutenant Denning that "he had been trying to get Ms. Yarbrough to take the baby to the doctor, and she hadn't done it. . . ." The baby was transported to University Medical Center in Lebanon.

Dr. Scott Giles, the medical examiner for Wilson County and the director of the emergency room at the University Medical Center, was on duty at the time Brian

Yarbrough arrived at the hospital. The call preceding the victim's arrival stated that the ambulance team was "bringing in an approximately 18 month old child in full cardiac arrest." Dr. Giles met the ambulance when it arrived. He

> immediately noticed that the child was covered with linear bruises on his legs and arms as well as some larger bruises on his face. I noticed that he had no heart activity whatsoever which is unusual in a child that young. It takes quite an insult to stop a child's heart. At that time, I called the ambulance crew to call the police because the child had probably been beaten to death.

The child was moved into the emergency room, where resuscitation was attempted. Dr. Giles observed that the child "had hemorrhages in the retina in the back part of his eye which is considered very good evidence that he had been shaken or received a strong blow to the head." "The child never established any cardiac activity or any independent breathing." Dr. Giles diagnosed the death as the result of "shaking baby syndrome which is child abuse." "The immediate cause of death was intra cranial bleeding as a consequence of blunt force trauma to the head." Additionally, Dr. Giles rejected any hypothesis that the victim's injuries and ultimate death could have resulted from a fall or other "accident." By visual inspection of the victim, Dr. Giles concluded that the injuries occurred "certainly within the last 12 to 24 hours prior to his arrival [at the hospital.]"

Dr. Charles Harlan performed the autopsy on the child. The autopsy confirmed Dr. Giles diagnosis that "death occurred as result of blunt force trauma to the head." Dr. Harlan concluded that

> [t]he blunt force trauma to the head includes a number of different injuries. They include diffuse subarchnoid hemorrhage. . . .There are multiple contusions of the left cheek. A contusion is a bruise indicating that he received multiple blows to the left cheek. There is pulmonary congestion and hemorrhage which is part of the reaction to the injury to the head. There is a right subdural hematoma of 75 ccs that would be about 15 teaspoons that's located on the right side that is, it is in the space between the arachnoid membrane and durameter. The durameter . . . is the membrane which completely surrounds the brain. The consistency of this membrane is such that it is consistent with having been there for some 8 to 12 hours, most likely 8 to 10 hours prior to the time of death, and that indicates that the point of injury occurred some 8 to 10 hours, perhaps 8 to 12 hours prior to the time of death. There's also a . . .pooling of blood and soft tissue below the

3

scalp on the back of the head.

There are also multiple parallel linear contusions present here and there on the body . . . .

. . .injuries to the front of the body, which includes the contusions on the left cheek. It includes multiple of the parallel linear contusions which have approximate distance apart of a tenth of an inch, each of them. . . . Of the left and right sides of the body. . . .the various parallel linear contusions and they're approximately seven in number. Various parallel linear contusions and other straight line linear contusions that are present on the right side of the head. And there are at least four double parallel lines and then multiple single lines, approximately four of those. . . .the left side or view of the head and neck showing again the contusions on the cheek and at least two groupings of parallel linear contusions. The contusion present on the left ear lobe is probably a continuation of the parallel linear contusion grouping that is present slightly above and behind the left ear.

It is my opinion that the multiple parallel linear contusions are caused by the person being struck by some probably cylindrical object of approximately the same size and shape and consistency as a coat hanger. It could be either a coat hanger, a switch, another piece of metal or hard plastic. . . .

. . .

The contusions on the face are consistent with the face being struck by some object other than the object causing the parallel linear contusions and this could be such things as an open hand, a fist, a skillet, a number of different things. . . .

Lieutenant Anthony Murray, along with other law enforcement officers, conducted a search of the residence at 2104 Locust Grove Road. During the search, he discovered "[a] switch off a tree, or limb, small limb" "under the couch" in the living room. Detective Lieutenant David Kennedy, the lead investigator in the homicide of Brian Yarbrough, "took a statement" from the appellant "at 8:35 am the morning of the 6th." In this statement, the appellant explained that, on November 5, 1996, at approximately 2:00 or 3:00 pm, Christy Yarbrough picked him up at his grandmother's house and took him to the Locust Grove address. Later that afternoon, Christy took Deedy to the store, leaving sixteen month old Brian in the care of the nineteen year old appellant.

Brian and [the appellant] were sitting on the couch watching TV. Brian did not have any clothes on except his diaper. [The appellant] was on the telephone, Brian went in the kitchen and [the appellant] heard a jar

4

> break. Prior to Christy leaving the house Brian was misbehaving and [the appellant] told Christy to go out and get a switch. [The appellant] did not whip him then. [The appellant] whipped Brian after he broke the jar in the kitchen. [The appellant] hit Brian three or four times. After the spanking Brian sat down on the couch and watched TV. . . .

Christy and Deedy returned from the store approximately ten minutes later. They ate and then watched television.

> [The appellant] noticed Brian laying on the couch, his eyes were open but his body was limp. [The appellant] took Brian outside to get some fresh air because Brain didn't seem to be breathing right. . . . [He] laid Brian back on the couch. Brian's body was still limp. [He] picked Brian up and shook him to try and wake him up. [The appellant] laid Brian back on the couch and Brian started foaming at his mouth. . . . Foam also came out of Brian's nose. [The appellant] then picked Brian up and carried him to the bedroom and laid him on the bed.

At 10:35 pm on the evening of the 6th, the appellant provided a second statement in which he admitted that he "whipped Brian with the switch several times including hitting Brian on the face and head area." He further admitted that, "later on that night [he] hit Brian in the back of the head with the palm of [his] hand. . . ." He conceded that "[h]e didn't mean to hit Brian that hard on the back of the head."

At trial, the appellant testified in his own defense. He explained to the jury that his prior statements to the police were involuntary and coerced. He denied making any statement that he "smacked the baby with the palm of my hand . . . . I did not do anything to harm it." He further denied making the statement that "I didn't mean to hit Brian that hard on the back of his head." Notwithstanding these recantations, the appellant did not deny "switching" the child, in fact, he admitted that he "told Christy to go out and get a switch" "just in case Brian misbehaved." Moreover, the appellant admitted that the child "appear[ed] to be all right" when he first arrived at the house and that, after the appellant "switched" him, the child had marks on his body. He also related that there were others in the house during the ten hour period prior to the child's death, including his brother, the child's mother, and his cousin, Walter Love.

5

Based upon this evidence, the jury found the appellant guilty of first degree felony murder.

## I. Sufficiency of the Evidence

In his first issue, the appellant contends that the evidence is insufficient to support the jury's verdict finding the appellant guilty of first degree felony murder committed in the perpetration of aggravated child abuse. Specifically, the appellant asserts that his "use of a switch to spank [the victim] on the legs did not cause said child's death from head trauma." He adds that, "[s]imply put, [he] 'just can't take the blame for something' he did not do." In support of his position, the appellant argues that "[s]everal other people had access to the child in question for the ten hour period in which . . . the injuries . . . were inflicted."

To support a conviction for felony murder committed during the perpetration or attempt to perpetrate the offense of aggravated child abuse, the evidence must show, beyond a reasonable doubt, a "killing of another committed in the perpetration of or attempt to perpetrate any ... aggravated child abuse...." Tenn. Code Ann. § 39-13-202(a)(2) (1996 Supp.). As charged in the present case, "a person commits the offense of aggravated child abuse . . . who commits the offense of child abuse ... and: (1) The act of abuse results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a) (1996 Supp.). Child abuse is defined as follows:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury ... commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401 (1996 Supp.).

There is no dispute that the sixteen month old child died as the result of blunt force trauma to the head. The victim also had multiple bruises consistent with being

6

hit with a switch.  Expert testimony opined that these type of injuries were consistent with child abuse and inconsistent with an accidental fall.  The appellant conceded that the child was in his presence during the time period the fatal blows were inflicted and that he had hit the child with a switch.  Although, at trial, the appellant recanted his earlier statements that he hit the child in the head, it was for the jury to evaluate the credibility of his testimony.   Indeed, on appeal, it is not the prerogative of this court to revisit questions of witness credibility, that function being solely within the province of the trier of fact.  See generally  State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).  Rather, it is this court's duty to affirm the conviction if the evidence viewed in the light most favorable to the State is sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e).  Moreover, once a defendant is convicted, the presumption of innocence is removed and is replaced with the presumption of guilt so that on appeal the convicted defendant has the burden of demonstrating that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Although the evidence in this case is circumstantial, circumstantial evidence alone may be sufficient to support a conviction.  See  State v. Buttry, 756 S.W.2d 718, 821 (Tenn. Crim. App. 1988); State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).  However, if a conviction is based purely on circumstantial proof, the facts and circumstances must be so overwhelming as to exclude any other explanation except for the defendant's guilt.  See  State v. Black, 815 S.W.2d 166, 175 (Tenn.1991); State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987); Cooper, 736 S.W.2d at 129.  "It must establish such a certainty of guilt of the accused as to

convince the mind beyond a reasonable doubt that the [appellant] is the one who committed the crime." Tharpe, 726 S.W.2d at 896. When reviewing circumstantial evidence, this court must remember that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-57 (1958).

In the case sub judice, the evidence points unerringly to the appellant. A jury is not compelled to believe a defendant's version of the events surrounding a homicide, even if uncontradicted. Moreover, the jury could reasonably infer that the appellant inflicted the fatal blows based upon his access to the child, his admitted beating of the child with a switch, and his statement that "[he] didn't mean to hit Brian that hard on the back of the head." These facts and the inconsistencies in the appellant's accounts of the events would permit a rational juror to infer beyond a reasonable doubt that the appellant committed the offense of felony murder during the perpetration of aggravated child abuse. See Jackson v. Virginia, 443 U.S. at 317, 99 S.Ct. at 2789; Tenn. R. App. P. 13(e). This issue is without merit.

## II. Admissibility of Photographs of the Victim

In his final issue, the appellant contends that the trial court erred in allowing "gory and unduly prejudicial photographs" of the victim to be shown to the jury. Specifically, the appellant, relying on Gladson v. State, 577 S.W.2d 686 (Tenn. Crim. App. 1978), argues that, since the appellant did not dispute and was willing to stipulate as to the victim's cause of death, admission of the autopsy photographs of

8

the victim's internal organs are inadmissible.[1]

We do not find Gladson controlling in the case *sub judice*. In Gladson, the State argued that the photographs of the autopsy established the cause of death. Defense counsel offered to stipulate that the victim died as a result of injuries received in an altercation between the victim and the defendant. A panel of this court held that photographs of the victim's cranial bones and brain inadmissible in light of the defendant's stipulation. In the present case, although he now concedes the cause of death, at trial, the appellant never offered to stipulate the cause of death. Thus, this court is not bound by the result in Gladson.

Tennessee court's follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. Notwithstanding, a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, –U.S.–, 119 S.Ct. 1467 (1999); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993) (citation omitted); see also Tenn. R. Evid. 401. Additionally, the probative value of the photograph must outweigh any **unfair** prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 103 (emphasis added); Braden, 867 S.W.2d at 758; see also Tenn. R. Evid. 403. In this respect, we note that photographs of a murder victim are prejudicial by their very nature. However, prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial.

---

[1]We note that, although the appellant failed to object to the introduction of these photographs during the trial, the trial court did rule on their admissibility. Moreover, the appellant failed to raise this issue in his written motion for new trial. Notwithstanding this omission, at the hearing on the motion, counsel orally amended the motion to include this issue. The trial court agreed to hear the issue and, at the conclusion of the hearing, ruled upon the admissibility of the photographs. Accordingly, we proceed to review the issue.

Rather, what is excluded is evidence which is "unfairly prejudicial," in other words, that evidence which has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." See Vann, 976 S.W.2d at 103 (citations omitted).

Of the thirty-nine photographs of the victim tendered for introduction at trial, the trial court only permitted introduction of seven photographs. Three of the seven are autopsy photographs specifically depicting the injury sustained to the victim's cranial area. Other portions of the victim's body are not visible in these photographs. The remaining four photographs depict the numerous bruises inflicted upon the victim's body, specifically, the left side of the body, the right side of the body, the right side of the victim's head, and the left side of the victim's head. These four photographs were taken prior to the autopsy.

Upon review, we find the photographs relevant and lacking danger of unfair prejudice. Although we concede that the photographs are not pleasant to view, we also acknowledge, as did the trial court, that murder, by its very nature, is not pleasant. Indeed, in child abuse cases, particularly those resulting in the death of the child, it is not uncommon for medical testimony to play a central role in establishing the relationship between the injuries received and whether they were occasioned by accidental or non-accidental means. We conclude that the photographs in this case accurately depict the nature and the extent of the victim's injuries. Dr. Harlan explained to the court that the photographs of the autopsy were necessary to describe the actual extent of the fatal injuries and to be able to convey to laymen the complex medical testimony as to the manner and cause of death;

> one shows the subdural hematoma on the convex of the brain, and the other shows it on the under side after the brain has been removed to show the extent completely around the brain on the right side. The other of these shows the subgaleal hematoma which is present on the back of the head, showing its size, shape and character.

See, e.g., State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); State v. Smith,

868 S.W.2d 561, 576 (Tenn. 1993), <u>cert. denied</u>, 513 U.S. 960, 115 S.Ct. 417 (1994) (photographs used to illustrate witnesses' testimony admissible for this purpose). <u>But see</u> <u>State v. Duncan</u>, 698 S.W.2d 63 (Tenn. 1985), <u>cert. denied</u>, 475 U.S. 1031, 106 S.Ct. 1240 (1986) (where medical testimony adequately describes the degree of the injury, gruesome or graphic photographs should not be admitted). Additionally, the photographs of the victim's bruised body prior to the autopsy were relevant to establish the underlying offense of aggravated child abuse and were probative to explaining the nature of the injuries inflicted upon the victim which could not accurately be relayed verbally. Clearly, the photographs are relevant to establishing (1) the cause of death and (2) the underlying offense of aggravated child abuse.

Moreover, we conclude that the photographs were not especially gruesome or shocking in nature so as to preclude their admission. Although any photograph depicting the autopsy of a child would be inherently prejudicial in a criminal case, the photographs in the present case were more probative regarding the medical testimony of the victim's injuries than prejudicial. <u>See, e.g.</u>, <u>State v. Terrence L. Davis</u>, No. 02C01-9511-CR-00343 (Tenn. Crim. App. at Jackson, Jun. 2, 1997), <u>perm. to appeal denied</u>, (Tenn. Aug. 31, 1998) (photographs of child victim's autopsy admissible to show severity of injuries); <u>State v. James Dubose</u>, No. 01C01-9405-CC-00160 (Tenn. Crim. App. at Nashville, Aug. 25, 1995), *aff'd on other grounds*, 953 S.W.2d 649 (Tenn. 1997) (photograph of internal organs of child victim is probative in understanding testimony of medical examiner); <u>compare</u> <u>State v. Collins</u>, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998) (color photographs of bruised, bloodied, nude infant victim prejudicial where medical testimony undisputed); <u>State v. Cynthia Roberson and Rhodney Roberson</u>, No. 02C01-9503-CC-00059 (Tenn. Crim. App. at Jackson, Dec. 28, 1995) (introduction of autopsy photograph of child abuse victim did not depict injury resulting in death thus more prejudicial than probative). As such, we cannot conclude that introduction of these

photographs had a tendency to suggest a decision on an improper or unfair basis. The photographs were necessary to explain to the jury the cause of death to the child, *i.e.*, the result of a blow to a child's head, and that the injuries were not accidental. Though the photographs may be characterized as gruesome, they are relevant and are not so "unfairly prejudicial" as to bar their admission. We cannot conclude that the trial court abused its discretion by admitting these photographs. See Tenn. R. Evid. 403; State v. Evans, 838 S.W.2d 185 (Tenn. 1992), cert. denied, 510 U.S. 1064, 114 S.Ct. 740 (1994); Banks, 564 S.W.2d at 947. This issue is without merit.

For the reasons stated herein, we find no error of law requiring reversal. Accordingly, we affirm the appellant's judgment of conviction for first degree murder.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JERRY L. SMITH, Judge

_____
NORMA MCGEE OGLE, Judge